496 S.E.2d 447

**David P. HANLON, Plaintiff Below, Appellant,**

v.

**LOGAN COUNTY BOARD OF EDUCATION and Tim Murphy, Defendants Below, Appellees.**

**No. 23957.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 16, 1997.

Decided Nov. 20, 1997.

Basil R. Legg, Jr., Johnson, Simmerman & Broughton, Clarksburg, for Appellant.

DAVIS, Justice:

The plaintiff below and appellant herein, David P. Hanlon [hereinafter Hanlon], appeals from a final order of the Circuit Court of Kanawha County entered July 8, 1996. Ruling in favor of the defendants below and appellees herein, the Logan County Board of Education [hereinafter LCBOE or Board] and Tim Murphy [hereinafter Murphy], the circuit court affirmed a prior decision of the Administrative Law Judge [hereinafter ALJ] for the West Virginia Education and State Employees Grievance Board. In her December 29, 1994, order, the ALJ determined that the Board had not violated the provisions of W.Va.Code § 18A–3–2a(4) (1992) (Repl.Vol. 1993) in selecting Murphy, instead of Hanlon, for the position of head coach of boys' basketball at Logan High School.[1] The ALJ concluded further that the default language contained in W.Va.Code § 18–29–3(a) (1992) (Repl.Vol.1994) did not apply to the facts of this case.[2] Upon a review of the appellant's brief,[3] the record, and the relevant authorities, we are inclined to agree with the ruling of the circuit court and affirm that court's decision.

## I.

### FACTUAL AND PROCEDURAL HISTORY

In 1993, David Hanlon was the assistant boys' basketball coach at Logan High School.

---

1. Before the ALJ, Hanlon also suggested that Murphy's hiring contravened W.Va.Code § 18A–4–16 (1982) (Repl.Vol.1993). However, the ALJ found W.Va.Code § 18A–3–2a(4) "to be the more pertinent code section" and therefore declined to review the matter pursuant to § 18A–4–16. *See infra* note 22 for the text of § 18A–4–16 and note 23 for the text of § 18A–3–2a(4).

2. *See infra* note 25 for the text of W.Va.Code § 18–29–3(a).

3. Only the brief and argument of the appellant are before this Court for decision. Due to the appellee's failure to timely file a response brief, upon either the response's original due date or upon this Court's generous extension of that time, this Court, by order dated September 9, 1997, and pursuant to Rule 10(e) of the West Virginia Rules of Appellate Procedure,
 impose[d] the following sanctions upon the appellee in regard to th[is] proceeding: (1) the appellee, the Logan County Board of Education, is hereby precluded from filing an appellee's brief in th[is] proceeding; and (2) the appellee, the Logan County Board of Education, is hereby precluded from participating in oral argument on the Court's Argument Docket[.]
 We note further, though decline to address, the potential implication of ethical standards occasioned by the appellee's failure to appear in this matter. *See, e.g.,* W.Va. Rules of Professional Conduct Rule 1.1 ("Competence") and Rule 1.3 ("Diligence"). *See also* W.Va. Standards of Professional Conduct Standard I.C. ("Lawyers' Duties to the Court") and Standard I.D. ("Lawyers' Duties to the Client").

In March, 1993, the then-head boys' basketball coach at Logan High School resigned his position. As a result, Logan County Schools posted the Logan High School head basketball coaching position. Rather than directly accepting the applications himself, the Assistant Superintendent of Logan County Schools in charge of athletics [hereinafter Assistant Superintendent], with the approval of the Superintendent of Logan County Schools [hereinafter Superintendent], appointed a six-member hiring committee. The committee was comprised of the Assistant Superintendent in charge of athletics, the principal of Logan High School, the athletic director of Logan High School, and three community persons.[4]

Upon learning of the vacant coaching position, Hanlon, an employee of the Logan County Board of Education,[5] submitted his application to the hiring committee. Tim Murphy, an employee of the Upshur County Board of Education,[6] also applied for the position. After receiving approximately ten or twelve applications, the hiring committee interviewed all of the applicants and narrowed the field to three top choices. Murphy was among the top three candidates; Hanlon was not one of the committee's top selections. Each of the remaining three applicants was interviewed a second time, and the committee ultimately voted to offer Murphy the coaching position. The Superintendent then called several individuals to verify

Murphy's credentials and, upon confirming the committee's assessment of Murphy's qualifications, directed the Assistant Superintendent to offer the head coach position to Murphy. At the time this position was offered to Murphy, no full-time teaching positions were available in Logan County. Shortly thereafter, though, the Board determined that additional itinerant teachers would be needed to ensure that teachers received their required planning periods. As a result, Murphy applied for a position as an itinerant physical education [hereinafter PE] instructor.

During the July 8, 1993, meeting of the Logan County Board of Education, the Board ratified the action of the State Superintendent of Schools [7] of hiring Murphy as an itinerant PE teacher and as the head boys' basketball coach at Logan High School. The record reflects that Murphy signed his Logan County teaching contract on July 9, 1993, and that he accepted the extracurricular assignment as head boys' basketball coach on July 29, 1993.

Having not been selected for the head boys' basketball coaching position, Hanlon filed a grievance claiming that Murphy's hiring had been improper. On August 19, 1993, the principal of Logan High School denied Hanlon's grievance stating "[t]he committee appointed for the selection process did not recommend you as one of the two final candi-

---

**4.** Each of the committee's community members had either played basketball in high school and/or college or were actively involved in managing or coaching community basketball teams (*e.g.*, midget league). One of the community members happened also to be the son of the Logan High School athletic director. At some point after the committee's formation, the father and son committee members apparently became concerned about the appearance of impropriety arising from both of them serving on the committee. In part to alleviate these concerns, and in part due to medical problems, the Logan High School athletic director (father) continued to participate in the applicants' interviews, but abstained from the final vote to select the preferred coach candidate.

**5.** In addition to being the assistant boys' basketball coach for seven years at Logan High School, Hanlon had been an employee of the Logan County Board of Education since 1984. Prior to

his employment in Logan County, Hanlon was employed at Sherman High School in Boone County from 1973 to 1978, where he served for two years as the assistant boys' basketball coach and three years as the head coach of boys' basketball.

**6.** At the time of his application, Murphy was the head boys' basketball coach at Buckhannon–Upshur High School, where he had been employed since 1986. During that time, Murphy served one year as the freshman basketball coach, four years as the head girls' basketball coach, five years as the assistant boys' basketball coach, and one year as the head boys' basketball coach.

**7.** Although the record is unclear on this point, the ALJ decision indicates that the State Superintendent approved Murphy's hiring because the State Department of Education had taken over various positions within the Logan County school system.

dates for said position,[8] after interviewing all candidates." Thereafter, on August 27, 1993, Hanlon appealed to Level II. Although the Level II hearing was initially scheduled for September 7, 1993, it was not held until October 7, 1993.[9] By decision dated November 30, 1993,[10] the Assistant Superintendent[11] rejected Hanlon's arguments that "he should have been awarded the Coaching position for the Logan High School basketball team [pursuant to W.Va.Code § 18A–4–7a[12] because] he is the most qualified candidate." In denying Hanlon's grievance, the Assistant Superintendent found that "their [sic] is no evidence of arbitrariness or capriciousness in the decision to hire Mr. Murphy."

Hanlon then appealed directly to Level IV[13] on December 3, 1993. After holding several hearings, the Administrative Law Judge for the West Virginia Education and State Employees Grievance Board rendered a decision on December 29, 1994. The ALJ initially declined to address Hanlon's arguments regarding W.Va.Code § 18A–4–16 (1982) (Repl.Vol.1993)[14] finding reliance on this statutory provision misplaced in this

case. Similarly, the ALJ determined that the facts did not support a finding that Hanlon should prevail by default pursuant to W.Va.Code § 18–29–3(a) (1992) (Repl.Vol. 1994).[15]

Denying Hanlon's grievance, the ALJ determined that the Logan County LCBOE did not violate W.Va.Code § 18A–3–2a(4) (1992) (Repl.Vol.1993)[16] in selecting Murphy for the head basketball coach position instead of Hanlon. In this manner, the ALJ noted that, in hiring Murphy for the coaching position, the LCBOE did not hire an uncertified non-employee as contended by Hanlon because "Mr. Murphy qualified for certification, possessed a teaching certificate, and was an employee of Buckhannon–Upshur High School at the time this position was offered to him." The ALJ further concluded that the statute had not been violated because "although Mr. Murphy was offered the coaching position before he was selected for the itinerant PE position, he was hired for both positions at the same board meeting. Thus, the Board did not hire a non-employee as a coach but hired an employee." In sum,

---

8. The record indicates that one of the top three candidates withdrew his application thereby leaving only two top candidates for the coaching position.

9. Hanlon raises this delay as one of several reasons why he should be granted relief by default pursuant to W.Va.Code § 18–29–3(a) (1992) (Repl.Vol.1994). We will address these contentions in Section II.D., *infra*.

10. As for the delay in holding the Level II hearing and rendering the accompanying decision, the Assistant Superintendent noted that "[t]he initial hearing was continued at the Grievant's request and the decision was delayed by agreement of the parties."

11. The Assistant Superintendent rendering the Level II decision was not the same Assistant Superintendent who served on the hiring committee.

12. W.Va.Code § 18A–4–7a (1993) (Repl.Vol. 1993) discusses seniority and the procedures to be followed in employing, promoting, and transferring professional personnel. As this statute has not been addressed by either the ALJ's decision or the appellant's arguments before this Court, we likewise decline further treatment of this provision.

13. W.Va.Code § 18–29–4(c) (1992) (Repl.Vol. 1994) permits a grieved employee to appeal from

Level II to either Level III or Level IV. Hanlon contends that the LCBOE would not permit his direct appeal to Level IV, but instead insisted that he must first appeal to Level III. Ultimately, however, the record reflects that Hanlon was permitted to bypass the Level III proceedings and to proceed directly to Level IV.

14. *See infra* note 22 for the text of W.Va.Code § 18A–4–16.

15. Specifically, the ALJ noted that

other issues raised by the Grievant have been found to be without merit. These issues include:

1) Failure of the LCBOE to obtain written consent when the Level II hearing was continued twice, once on Grievant's request and the second (three days later) at the LCBOE's request. *Grievant did not object to either continuance.*

. . . . .

4) Failure of LCBOE to receive written consent of parties to extend time lines for issuing a Level II decision. *The parties had agreed to this extension verbally.*

(Italicized emphasis added). *See infra* note 25 for the text of W.Va.Code § 18–29–3(a).

16. *See infra* note 23 for the text of W.Va.Code § 18A–3–2a(4).

the ALJ was unable to find that either the hiring committee or the Superintendent had "acted in an arbitrary and capricious manner.... Although reasonable minds may differ, and perhaps frequently do when it comes to selecting coaches, the decision to hire Mr. Murphy was not an abuse of discretion."

Hanlon then appealed to the Circuit Court of Kanawha County. By order dated July 8, 1996, the circuit court "conclude[d] that the decision of the Administrative Law Judge was neither clearly wrong nor arbitrary or capricious, and that the questions of law were decided correctly.... Accordingly, it is hereby ORDERED that the decision of the Administrative Law Judge be and the same is hereby affirmed." It is from this ruling of the circuit court that Hanlon appeals to this Court.[17]

## II.

## DISCUSSION

On appeal to this Court, Hanlon presents three arguments in support of his request that we overturn the decision of the Circuit Court of Kanawha County. First, he argues that Murphy's hiring violated W.Va.Code § 18A-4-16 (1982) (Repl.Vol.1993)[18] in that Murphy was not an employee of the Logan County Board of Education at the time he

was hired for the coaching position. Second, Hanlon contends that the hiring was in contravention of W.Va.Code § 18A-3-2a(4) (1992) (Repl.Vol.1993)[19] because Hanlon, a qualified applicant employed by the hiring board of education, applied for the job. Finally, Hanlon submits that, in any event, he is entitled to a default judgment pursuant to W.Va.Code § 18-29-3(a) (1992) (Repl.Vol. 1994)[20] because the LCBOE did not adhere to the time requirements contained in W.Va. Code § 18-29-4(b) (1992) (Repl.Vol.1994).[21] After a discussion of the applicable standard of review, we will address the merits of Hanlon's contentions.

### A. Standard of Review

In determining whether a circuit court properly has reviewed a decision of the Administrative Law Judge for the West Virginia Education and State Employees Grievance Board, it is first necessary to review the statutory provision permitting appeal to the circuit court. W.Va.Code § 18-29-7 (1985) (Repl.Vol.1994) directs that:

The decision of the hearing examiner [of the West Virginia Education and State Employees Grievance Board] shall be final upon the parties and shall be enforceable in circuit court: Provided, That either party may appeal to the circuit court of the county in which the grievance occurred on

17. At this juncture, we note that various statements of fact made by the appellant do not comport with the facts actually contained in the record before this Court. Accordingly, we reiterate our prior admonishment to appellate counsel to ensure that representations made before this Court are accurate in their existence and in their content:

As a reminder to future appellants, we point out that an explicit statement or implicit suggestion in the briefs that there exists a[ particular fact] when, in fact, there is no [such fact] is misleading. Appellants are required to determine the existence [and accuracy of the facts upon which they rely] before attempting to invoke the appellate jurisdiction of this Court. Failure to do so not only wastes the precious and limited resources of this Court, but also those of the lawyers and their clients. *We do not wish to be perceived as "sticklers, precisians, nitpickers, or sadists. But in an era of swollen appellate dockets, courts are entitled to insist" on diligence and good faith efforts from the practicing bar so that the appellate decisional process can proceed as it should.*

*Coleman v. Sopher,* 194 W.Va. 90, 96, 459 S.E.2d 367, 373 (1995) (quoting *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1224 (7th Cir.1995)) (emphasis added). We note further that a party's misrepresentation of facts to a court may implicate ethical violations, though we save for another day further discussion of this matter. *See, e.g.,* W.Va. Rules of Professional Conduct Rule 3.3 ("Candor toward the tribunal"). *See also* W.Va. Standards of Professional Conduct Standard I.C. ("Lawyers' Duties to the Court").

18. *See infra* note 22 for the text of W.Va.Code § 18A-4-16.

19. *See infra* note 23 for the text of W.Va.Code § 18A-3-2a(4).

20. *See infra* note 25 for the text of W.Va.Code § 18-29-3(a).

21. *See infra* note 26 for the text of W.Va.Code § 18-29-4(b).

the grounds that the hearing examiner's decision (1) was contrary to law or lawfully adopted rule, regulation or written policy of the chief administrator or governing board, (2) exceeded the hearing examiner's statutory authority, (3) was the result of fraud or deceit, (4) was clearly wrong in view of the reliable, probative and substantial evidence on the whole record, or (5) was arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. Such appeal shall be filed in the circuit court of Kanawha County or in the circuit court of the county in which the grievance occurred[.]

The court may reverse, vacate or modify the decision of the hearing examiner or may remand the grievance to the chief administrator of the institution for further proceedings.

▮ Having once reached the circuit court by way of appeal, " '[a] final order of the hearing examiner for the West Virginia Educational Employees Grievance Board, made pursuant to W.Va.Code, 18–29–1, *et seq.* [ (1992) (Repl.Vol.1994) ], and based upon findings of fact, should not be reversed unless clearly wrong.' Syllabus Point 1, *Randolph County Board of Education v. Scalia,* 182 W.Va. 289, 387 S.E.2d 524 (1989)." Syl. pt. 1, *Martin v. Randolph County Bd. of Educ.,* 195 W.Va. 297, 465 S.E.2d 399 (1995). That is not to say, however, that we necessarily may decide anew those matters with which we disagree with the ALJ or the circuit court.

Th[e clearly erroneous] standard does not entitle a reviewing court to reverse the finder of fact simply because it may have decided the case differently.... Indeed, if the lower tribunal's conclusion is plausible when viewing the evidence in its entirety, the appellate court may not reverse

even if it would have weighed the evidence differently[.]

*Board of Educ. of County of Mercer v. Wirt,* 192 W.Va. 568, 578–79, 453 S.E.2d 402, 412–13 (1994) (citing *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985)) (footnotes omitted). *See also* Syl. pt. 1, in part, *In the Interest of Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996) ("A finding [of fact] is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.").

Clarifying further the extent of this Court's review, we additionally noted in *Martin* that:

in reviewing an ALJ's decision that was affirmed by the circuit court, this Court accords deference to the findings of fact made below. This Court reviews decisions of the circuit under the same standard as that by which the circuit reviews the decision of the ALJ. We must uphold any of the ALJ's factual findings that are supported by substantial evidence, and we owe substantial deference to inferences drawn from these facts.... We review *de novo* the conclusions of law and application of law to the facts.

195 W.Va. at 304, 465 S.E.2d at 406. Having established the applicable standard of review, we apply these procedures to our evaluation of Hanlon's contentions.

### B. Propriety of Hiring under W.Va.Code § 18A–4–16

▮ Hanlon first argues that the Logan County Board of Education violated W.Va. Code § 18A–4–16 (1982) (Repl.Vol.1993)[22] by

---

**22.** W.Va.Code § 18A–4–16 (1982) (Repl.Vol. 1993) ("Extracurricular assignments") provides, in its entirety:

(1) The assignment of teachers and service personnel to extracurricular assignments shall be made only by mutual agreement of the employee and the superintendent, or designated representative, subject to board approval.

Extracurricular duties shall mean, but not be limited to, any activities that occur at times other than regularly scheduled working hours, which include the instructing, *coaching,* chaperoning, escorting, providing support services or caring for the needs of students, and which occur on a regularly scheduled basis.

selecting Murphy for the head coaching position. He urges this Court to construe this provision as requiring an individual to be an employee of a particular county's board of education before that county can enter into an extracurricular assignment agreement with that person.

Upon a review of this statute, we find Hanlon's construction thereof to be somewhat erroneous. Although this provision differentiates between a school employee's contract of employment and his/her extracurricular assignments and specifies that the extracurricular assignment is separate and apart from the employee's employment contract, *see, e.g.,* Syl. pt. 2, in part, *Cruciotti v. McNeel,* 183 W.Va. 424, 396 S.E.2d 191 (1990); *Smith v. Board of Educ. of County of Logan,* 176 W.Va. 65, 67, 341 S.E.2d 685, 686 (1985), the statute does not specifically direct that a school employee employed by a county board of education may only accept extracurricular assignments in that county. Rather, the regulations clarifying the hiring process for extracurricular coaching assignments suggest the opposite result: "[a] member of a faculty in one school may coach in another school provided that it meets with the approval of the said County Board of Education *or two different Boards of Education.*" 9A W.Va.C.S.R. § 127–3–6.2 (1990) (emphasis added). Reviewing this language, it appears that a school employee of one county may quite properly agree to accept an extracurricular coaching assignment in another county provided both boards agree to the arrangement. Therefore, we cannot adopt Hanlon's construction of W.Va.Code § 18A–4–16 as requiring extracurricular coaching assignment agreements to be made with only those individuals employed by the county board for which the assignment is to be performed. Instead, we hold that W.Va.

Code § 18A–4–16 (1982) (Repl.Vol.1993) does not preclude a county board of education from entering into an extracurricular coaching assignment agreement with an individual employed by another county's board of education provided both county boards of education agree to the proposed arrangement.

■ Proceeding now to an application of this holding to the facts presently before us, we find that the LCBOE's hiring of Murphy as the head boys' basketball coach did not contravene W.Va.Code § 18A–4–16. Even though our analysis above indicates that Murphy quite properly could have entered into an extracurricular coaching assignment with the LCBOE while he was employed by the Upshur County Board of Education, we need not determine this issue upon this factual posture. The record before us clearly indicates that the LCBOE approved the State Superintendent's recommendation to hire Murphy for both the itinerant PE teacher job and the head boys' basketball coach position at the same board meeting. Further, the contracts evidencing these employments demonstrate that Murphy first was hired as an itinerant PE teacher, then, some twenty days later, he entered into the extracurricular assignment agreement for the coaching job in question. Thus, Murphy was an employee of the LCBOE at the time he was hired for the coaching position, and the LCBOE's decision to hire him in this capacity was proper.

### C. Propriety of Hiring under W.Va.Code § 18A–3–2a(4)

■ Hanlon's next argument turns upon an interpretation of W.Va.Code § 18A–3–2a(4) (1992) (Repl.Vol.1993).[23] Embellishing

---

(2) The employee and the superintendent, or a designated representative, subject to board approval, shall mutually agree upon the maximum number of hours of extracurricular assignment in each school year for each extracurricular assignment.

(3) The terms and conditions of the agreement between the employee and the board of education shall be in writing and signed by both parties.

(4) An employee's contract of employment shall be separate from the extracurricular as-

signment agreement provided for in this section and shall not be conditioned upon the employee's acceptance or continuance of any extracurricular assignment proposed by the superintendent, a designated representative, or the board.

(Emphasis added).

**23.** W.Va.Code § 18A–3–2a(4) (1992) (Repl.Vol. 1993) states:

In accordance with state board of education rules for the education of professional edu-

upon his understanding of W.Va.Code § 18A–4–16, Hanlon contends that W.Va. Code § 18A–3–2a(4) permits a county board of education to hire an individual, who is not currently employed by that board, as a coach only if "a currently employed certified professional educator has not applied for the position." In this manner, Hanlon suggests that Murphy's hiring was inappropriate because Hanlon, "a currently employed certified professional educator," had applied for the head coaching position at Logan High School.

Again, though, Hanlon's statutory construction misinterprets the statutory language as it applies to the facts presently before us. While it is true that a board of education's authority to hire an individual as a coach is restricted in some circumstances where "a currently employed certified professional educator" has applied for the position, this proviso does not apply to the instant case. W.Va.Code § 18A–3–2 (1990) (Repl.Vol.1993) requires "[a]ny professional educator ... who is employed within the public school system of the state shall hold a valid teaching certificate licensing him or her to teach in the specializations and grade levels as shown on the certificate for the period

of his or her employment." In accordance with this requirement, W.Va.Code § 18A–3–2a permits the State Superintendent of Schools to issue such certificates.[24] Additionally, subsection (4) of § 18A–3–2a permits the issuance of other certificates to those "persons who do not qualify for the professional or paraprofessional certificate." Within this category of other certificates, the State Superintendent also has the authority to "issue certificates for persons to serve in the public schools as athletic coaches or other extracurricular activities coaches" subject to various limitations.

Hanlon contends that Murphy's hiring as a coach was improper because the § 18A–3–2a(4) limitations permit granting a special coaching certificate to an individual only if "a currently employed certified professional educator has not applied for the position." This construction, though, ignores the fact that the limitations imposed by subsection (4) apply only to those individuals who do not possess a valid teaching certificate. As Murphy had a valid teaching certificate at the time of the events at issue, his hiring was not governed by the provisions contained in subsection (4). Rather, Murphy qualified for the coaching assignment without having to resort

cators adopted after consultation with the secretary of education and the arts, the state superintendent of schools may issue certificates valid in the public schools of the state: *Provided, That a certificate shall not be issued to any person who is not a citizen of the United States, is not of good moral character and physically, mentally and emotionally qualified to perform the duties for which the certification would be granted and who has not attained the age of eighteen years on or before the first day of October of the year in which the certificate is issued[.]*

Certificates authorized to be issued include:

. . . . .

(4) *Other certificates; permits.—Other certificates and permits may be issued, subject to the approval of the state board, to persons who do not qualify for the professional or paraprofessional certificate.* Such certificates or permits shall not be given permanent status and persons holding such shall meet renewal requirements provided by law and by regulation, unless the state board declares certain of these certificates to be the equivalent of the professional certificate.

*Within the category of other certificates and permits, the state superintendent may issue cer-*

*tificates for persons to serve in the public schools as athletic coaches or other extracurricular activities coaches* whose duties may include the supervision of students, subject to the following limitations: (A) Such person shall be employed under a contract with the county board of education which specifies the duties to be performed, which specifies a rate of pay equivalent to the rate of pay for professional educators in the district who accept similar duties as extra duty assignments and which provides for liability insurance associated with the activity: Provided, That such persons shall not be considered employees of the board for salary and benefit purposes other than as specified in the contract; (B) *a currently employed certified professional educator has not applied for the position;* and (C) such person completes an orientation program designed and approved in accordance with state board rules which shall be adopted no later than the first day of January, one thousand nine hundred ninety-one.

(Emphasis added).

24. W.Va.Code § 18A–3–2a(1) refers to the general "teaching certificate" mentioned in W.Va. Code § 18A–3–2 as a "professional teaching certificate."

to these particular provisions. As such, the actions of the LCBOE in hiring Murphy for the head boys' basketball coaching position were proper and did not violate W.Va.Code § 18A–3–2a(4).

### D. Entitlement to Relief by Default pursuant to W.Va.Code §§ 18–29–3(a) and 18–29–4(b)

■ Finally, Hanlon contends that he is entitled to the head coaching position as a result of the "relief by default" provision contained in W.Va.Code § 18–29–3(a) (1992) (Repl.Vol.1994)[25] and the grievance time periods found in W.Va.Code § 18–29–4(b) (1992) (Repl.Vol.1994).[26]

With respect to the proceedings below, Hanlon claims that the LCBOE improperly continued the Level II hearing without his consent. While the facial language of W.Va. Code § 18–29–3(a) does not specifically state that a grieved employee may seek "relief by default" if a grievance evaluator fails to commence a hearing within a specified time, we previously have decided this precise issue in *Martin v. Randolph County Board of Education*, 195 W.Va. 297, 465 S.E.2d 399. In *Martin*, we determined that the word "response," synonymous in this context with "respond," "was intended to include hearings," thereby permitting a grieved employee to seek "relief by default" where the default

was occasioned by a delay in holding a hearing. 195 W.Va. at 305–06, 465 S.E.2d at 407–08. However, we tempered this ruling with our heavy reliance upon the ALJ's determination that the grieved employee waived her right to complain of this delay. Reiterating our standard of review, we emphasized that:

> the findings of the ALJ must be upheld, if at all, on the basis articulated by the ALJ.... Moreover, we base our review of the ALJ's determination on the full administrative record that was before the ALJ at the time she made her decision.
>
> As a general rule, we uphold the factual findings of an ALJ if they are supported by substantial evidence.... We must defer to the ALJ's ... inferences from the evidence, despite our perception of other, more reasonable conclusions from the evidence.

*Id.*, 195 W.Va. at 306, 465 S.E.2d at 408 (citations omitted).

■ Before determining the propriety of the ALJ's ruling in the proceedings underlying this appeal, we note, at the outset, the statutory requirements of W.Va.Code § 18–29–3(a). Essentially, W.Va.Code § 18–29–3(a) (1992) (Repl.Vol.1994) makes mandatory the time periods within which grievances by educational employees must be filed, heard, and decided. If a grievance evaluator does

---

**25.** W.Va.Code § 18–29–3(a) (1992) (Repl.Vol. 1994) ("Grievance procedure generally") directs, in part:

> (a) A grievance must be filed within the times specified in section four [§ 18–29–4] of this article and shall be processed as rapidly as possible. The number of days indicated at each level specified in section four of this article shall be considered as the maximum number of days allowed and, if a decision is not rendered at any level within the prescribed time limits, the grievant may appeal to the next level: Provided, That the specified time limits may be extended by mutual written agreement.... *If a grievance evaluator required to respond to a grievance at any level fails to make a required response in the time limits required in this article, unless prevented from doing so directly as a result of sickness or illness, the grievant shall prevail by default.* Within five days of such default, the employer may request a hearing before a level four hearing examiner for the purpose of showing that the remedy received by the prevailing grievant is contrary to law or clearly wrong. In making a determi-

nation regarding the remedy, the hearing examiner shall presume the employee prevailed on the merits of the grievance and shall determine whether the remedy is contrary to law or clearly wrong in light of that presumption. If the examiner finds that the remedy is contrary to law, or clearly wrong, the examiner may modify the remedy to be granted so as to comply with the law and to make the grievant whole.

(Emphasis added).

**26.** W.Va.Code § 18–29–4(b) (1992) (Repl.Vol. 1994) provides, in pertinent part:

> (b) Level two.
> Within five days of receiving the decision of the immediate supervisor, the grievant may appeal the decision to the chief administrator, and *such administrator or his or her designee shall conduct a hearing* in accordance with section six [§ 18–29–6] of this article *within five days of receiving the appeal and shall issue a written decision within five days of such hearing*[.]

(Emphasis added).

not comply with the hearing and decision time periods, and his/her inaction does not come within one of the enumerated statutory exceptions, "the grievant shall prevail by default." W.Va.Code § 18–29–3(a) (1992) (Repl.Vol.1994). Nevertheless, upon the record before us, we are unable to conclude that the ALJ was clearly wrong in finding Hanlon's claim for "relief by default," based upon the untimely hearing, to be without merit. Despite the fact that Hanlon was represented at the Level II proceedings by the Executive Director of the West Virginia Professional Educators, the record does not evidence, and the ALJ confirms, that either Hanlon or his representative objected to the rescheduling of that hearing. Likewise, neither Hanlon nor his representative raised the "relief by default" issue at this hearing or otherwise brought this matter to the attention of the Assistant Superintendent.

Long standing case law and procedural requirements in this State mandate that a party must alert a tribunal as to perceived defects at the time such defects occur in order to preserve the alleged error for appeal. For example, Rule 46 of the West Virginia Rules of Civil Procedure directs:

Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary *it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor*[.]

(Emphasis added). *See also Maples v. West Virginia Dep't of Commerce, Div. of Parks & Recreation,* 197 W.Va. 318, 322–23, 475 S.E.2d 410, 414–15 (1996) (explaining requirements of W.Va.R.Civ.P. 46); *Konchesky v. S.J. Groves & Sons Co., Inc.,* 148 W.Va. 411, 414–16, 135 S.E.2d 299, 302–03 (1964) (same). We further have refused to:

consider an error which is not properly preserved in the record nor apparent on the face of the record. . . .

To preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect. The rule in West Virginia is that parties must speak clearly in the circuit court[,] on pain that, if they forget their lines, they will likely be bound forever to hold their peace ... [sic] It must be emphasized that the contours for appeal are shaped at the circuit court level by setting forth with particularity and at the appropriate time the legal ground upon which the parties intend to rely.

*State v. Browning,* 199 W.Va. 417, 425, 485 S.E.2d 1, 9 (1997) (quoting *State ex rel. Cooper v. Caperton,* 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996)) (citations omitted).

■ Though we do not profess to require grievance proceedings to adhere to the procedural rules and specific objection requirements applicable to circuit court proceedings, we do believe it necessary that the issue of an employee's entitlement to "relief by default" be presented to the grievance evaluator to ensure that the matter is either dealt with at its point of origin or properly preserved for appellate review. Therefore, we hold that, in order to benefit from the "relief by default" provisions contained in W.Va. Code § 18–29–3(a) (1992) (Repl.Vol.1994), a grieved employee or his/her representative must raise the "relief by default" issue during the grievance proceedings as soon as the employee or his/her representative becomes aware of such default.

Following the above-described procedure ensures that the appellate record before this Court will be complete in its preservation of errors alleged in the lower grievance proceedings. Furthermore, the employer's entitlement to a hearing on the default issue, as provided by this section, cannot be given complete effect without requiring an employee to bring the alleged default to the attention of the grievance evaluator. Common sense dictates that one cannot request a hearing on a default issue if one has not realized that a default has occurred, and it is naive to assume that an employer, recognizing that a default has occurred, will effectively concede to the default by asserting its entitlement to a hearing even though neither the employee nor the grievance evaluator has acknowledged such default. Thus, because neither Hanlon nor his representative raised

the hearing continuances as invoking the "relief by default" issue, we deem waived his right to raise this issue on appeal.

Likewise, Hanlon seeks relief based upon the delay of the Assistant Superintendent in rendering the Level II decision. However, both the Assistant Superintendent and the ALJ recognized that Hanlon, himself, had agreed to an extension of this time period. As we noted above and reiterate here, the findings of an ALJ are entitled to substantial deference and cannot be set aside unless they are clearly wrong. Again, we are unable to say that the ALJ's findings in this regard were clearly wrong.

 Furthermore, although the late decision could have supported relief by default, particularly where this issue was, in fact, brought to the grievance evaluator's (ALJ's) attention, such a result is not appropriate in this case where Hanlon, himself, apparently consented to the delay. A party simply cannot acquiesce to, or be the source of, an error during proceedings before a tribunal and then complain of that error at a later date. *See, e.g., State v. Crabtree*, 198 W.Va. 620, 627, 482 S.E.2d 605, 612 (1996) ("Having induced an error, a party in a normal case may not at a later stage of the trial use the error to set aside its immediate and adverse consequences."); *Smith v. Bechtold*, 190 W.Va. 315, 319, 438 S.E.2d 347, 351 (1993) ("[I]t is not appropriate for an appellate body to grant relief to a party who invites error in a lower tribunal." (Citations omitted).). Thus, because the findings of the ALJ were not clearly wrong with respect to Hanlon's agreement to delay the issuance of the Level II decision, we conclude that Hanlon is not entitled to "relief by default" on this ground.

### III.

### CONCLUSION

For the foregoing reasons, we affirm the decision of the Circuit Court of Kanawha County.

Affirmed.